## TILDEN et al. v. QUAKER OATS CO. et al.

(Circuit Court of Appeals, Seventh Circuit. July 23, 1924.)

No. 3129.

1. **Monopolies ⬉28—Rule stated as to effect, in action for damages, of general charges of combination and conspiracy.**

Mere general charges of combination and conspiracy in the declaration in an action for damages under Anti-Trust Act, § 7 (Comp. St. § 8829), avail nothing, unless and until there is averred the commission of an act or acts denounced by the statute as conferring a right to ensuing damages.

2. **Monopolies ⬉28 — General allegation of conspiracy formed and carried into effect years before plaintiff corporation entered into successful competing business held insufficient.**

An action for damages under Anti-Trust Act, § 7 (Comp. St. § 8829), by receivers of a corporation, is not aided by general allegations of a conspiracy formed and carried into effect years before plaintiff corporation was organized and entered into competing business, which it successfully carried on for a long period.

3. **Monopolies ⬉28—Allegations in declaration in action for damages held irrelevant.**

In the declaration in an action for damages under Anti-Trust Act, § 7 (Comp. St. § 8829), by the receivers of a corporation, allegations of the payment of illegal salaries and dividends and other unlawful acts of its officers and directors are irrelevant.

4. **Monopolies ⬉28—Matters held not to constitute basis of cause of action for damages.**

That a corporation, by a contract which it had power to make, sold a part of its plant and equipment to a competitor, for which it received the consideration, so long as the contract is allowed to stand and the consideration is retained, affords no basis for an action for damages under Anti-Trust Act, § 7 (Comp. St. § 8829), for conspiracy to injure its business.

5. **Corporations ⬉432(I)—Proxies given by stockholders to directors held presumably to cover ratification of contract previously made by directors.**

Stockholders, who execute proxies to directors to vote for them at meeting of shareholders, presumably intend to fully endow the proxy holders with authority to act for them in any matter competently coming before the meeting, and an allegation merely that directors concealed from them their intention to vote for ratification of contract previously made by directors is insufficient to support contention that corporation did not lawfully assent to the contract.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Action at law by William A. Tilden and Charles D. Thompson, receivers of the Great Western Cereal Company, against the Quaker Oats Company and others. Judgment for defendants, and plaintiffs bring error. Affirmed.

Of the parties:

(1) The plaintiff, Charles D. Thompson, is the surviving receiver of the Great Western Cereal Company under appointment by the Court of Chancery of New Jersey;

(2) The defendant Quaker Oats Company is a corporation organized as hereinafter detailed;

(3) The defendants Henry P. Crowell, Robert Stuart, James H. Douglas, John Stuart, A. Stamford White, John P. Welling, J. R. Nutt, James H. Andrews, and Whiting G. Snow are, as averred in the declaration, a majority of the board of directors of the Quaker Oats Company, and were such at the time of the transactions set forth in the declaration; and

(4) The defendants Joy Morton, Sterling Morton, T. F. Bliss, Jr., Edward H. Stearns, S. T. Butler, Daniel Peterkin, Mark Morton, Wendell J. Wright, J. P. Gates, V. S. Lawrence, and F. P. Sawyer are averred in the declaration to comprise a majority of the board of directors of the Great Western Cereal Company at the times averred in the declaration.

The declaration may be summarized:

(1) At various times during a period from 1888 to the filing of the declaration (1913) the "said defendants have conspired to monopolize a part of the trade and commerce * * * to wit, the trade and commerce in oatmeal and oatmeal by-products."

(2) That, for a number of years prior to 1889, nine several corporations, persons, and firms were competitively engaged in manufacturing cereal foods, such firms and their location being specified in the declaration, and in their aggregate trade and commerce controlled and conducted more than 50 per cent. of the entire trade and commerce among the several states of the United States in oatmeal and oatmeal by-products; that one of such competitors, viz. Quaker Mills Company, had acquired a valuable good will in a brand known as "Quaker Oats," as applied to oatmeal products; that in 1889 the nine competitors, last above referred to, organized pools or common arrangements styled "Oatmeal Miller Association" and "Consolidated Oatmeal Company" for the purpose "of eliminating the competition then and theretofore existing between the said persons * * * in the aforesaid interstate trade and commerce in oatmeal products and by-products, and of monopo-

lizing said interstate trade and commerce and maintaining the prices upon said oatmeal products and by-products," which arrangement continued during the years 1889, 1890, and part of the year 1891, until the organization of a corporation known as "American Cereal Company"; that "the members of said pool, in furtherance of the purpose of said combination, by mutual agreement allotted to each member * * * a certain percentage of the total interstate trade and commerce conducted by all, * * * each * * * reporting the volume of its business monthly to the secretary of said pool," and providing for refund by all who sold in excess of the allotment, such refund to be paid to those who failed to sell their allotment, all of which was further accompanied by price fixing by a committee, and by the imposition of penalties against those who failed to abide by the understandings thus entered into.

(3) The defendants Crowell, Stuart, Nutt, and certain others, in 1891, organized the American Cereal Company, under the laws of New Jersey, "for the purpose of carrying on the aforesaid pools or common arrangements," and in furtherance of the common design to restrain and monopolize trade and commerce in oatmeal products and by-products, and caused the properties of certain of the nine members of the pre-existing pool to be conveyed to said corporation in exchange for shares of the capital stock, which members thereupon ceased to carry on their aforesaid trade, and said corporation American Cereal Company became possessed of the same, including the good will attached to the brand known as "Quaker Oats," and "thereby created a monopoly of approximately 50 per cent." of said trade and commerce, and the defendants (the third group above mentioned), through said corporation, managed, controlled, and directed its affairs, and thereby controlled approximately 50 per cent. of the total trade and commerce among the states in oatmeal products from that time until approximately September 21, 1901, when the business of said American Cereal Company passed into the control of the defendant the Quaker Oats Company.

(4) That on September 21, 1901, the defendant Quaker Oats Company was organized as a corporation under the laws of New Jersey, by the defendant Crowell and others (principally those in group 3, supra), "in order to further restrain and monopolize trade and commerce," and upon its organization to acquire 95 per cent. of the capital

1 F.(2d)—11

stock of said American Cereal Company, "by means whereof," so it is averred, the defendant Quaker Oats Company and said individual defendants, from September, 1901, to August, 1904, "conducted and controlled the interstate trade and commerce in oatmeal products and by-products, previously carried on by said American Cereal Company, amounting to approximately 50 per cent." thereof, and said defendants, on or about August 23, 1906, "in order to further restrain and monopolize the trade and commerce * * * in oatmeal products, * * * caused the physical properties, good will, and interstate trade and commerce of said American Cereal Company to be conveyed by it" to the defendant Quaker Oats Company, by means whereof said individual defendants acquired through said defendant the Quaker Oats Company approximately 50 per cent. of said interstate trade and commerce in oatmeal products and by-products. From August 23, 1906, to the date of the filing of the declaration, the defendant Quaker Oats Company was engaged in converting cereals into oatmeal, etc., possessed and operated certain mills specified, distributed the same throughout the United States, imported large quantities of cereals into the states named for the purpose of manufacture at its mills, and thereafter shipped in interstate commerce in competition with oatmeal and other cereal products manufactured and sold by the Great Western Cereal Company (of which the plaintiff is now receiver).

(5) On June 22, 1911, and for several years prior thereto, the defendant Quaker Oats Company was the largest manufacturer and distributor of oatmeal and other cereal products in the United States, and enjoyed the largest interstate trade and commerce therein; that the Great Western Cereal Company, on such date and prior thereto, was its principal competitor; that the Quaker Oats Company enjoyed a large and extensive trade in a brand of oatmeal known as "Quaker Oats," sold by defendant in interstate trade and commerce in competition with a brand known and designated as "Mother's Oats," sold by the Great Western Cereal Company in like interstate trade and commerce.

(6) From April, 1901, to June, 1911, the Great Western Cereal Company was a corporation organized under the laws of New Jersey capitalized at $3,000,000, and engaged in converting cereals into food products, selling the same throughout the United States, and for that purpose was pos-

sessed of mills and the requisite properties for manufacture at the places designated, and was possessed of all the trade-marks, good will, and other real and personal property described in the contract entered into between the two companies. It purchased and moved in interstate commerce large quantities of cereals, and after manufacture shipped the manufactured cereal product in like interstate commerce throughout the United States, in competition with the defendant Quaker Oats Company. It expended large sums of money in advertising its products, furthering and increasing its business. It put up and sold principally certain oat, wheat, and corn products under the trade-name "Mother's," "Mother's Oats," etc., the latter being in direct competition with a brand of oatmeal manufactured and sold by the defendant Quaker Oats Company under the trade-name of "Quaker Oats." Such brand, trade-name, and good will incident to its use had become very valuable, and the value of its mills, properties, and business were dependent upon the continuance of business in the making and selling of its products under such trade-names and designations. Had the Great Western Cereal Company been enabled to continue in business, free from the "unlawful agreements and acts of said defendants," its business from 1904 to 1911 would have produced a large profit, $180,000 per annum. Its plants, properties, good will, and trade-marks (specified in a contract hereafter to be referred to as executed June 22, 1911) were worth $3,000,000. The declaration specified the relative percentages of its package goods and animal feed manufactured at dates specified.

(7) From June 2, 1909, to June 22, 1911, the defendants (group 4, supra) comprised the majority of the board of directors of Great Western Cereal Company, and from April, 1904, to June 22, 1911, the defendant Quaker Oats Company conducted 60 per cent. of the entire trade and commerce among the several states of the United States. The Great Western Cereal Company conducted 30 per cent. of such entire trade and commerce. During such last-mentioned period, the defendants (group 3, supra) constituted a majority of the board of directors of the defendant Quaker Oats Company, and they "conspired with the said defendants * * * (group 4) * * * to restrain the aforesaid trade and commerce of the said Cereal Company among the several states of the United States in oatmeal and other cereal products and by-products, and to eliminate the aforesaid competition between said Cereal Company and the said Quaker Oats Company in such interstate trade and commerce and to secure to said Quaker Oats Company a monopoly of such interstate trade and commerce in oatmeal and other cereal products and by-products in the manner and by the means" specified.

(8) " * * * The said defendants from time to time during the period last aforesaid, entered into various trade agreements and trade arrangements between themselves and said defendant Quaker Oats Company and said Cereal Company governing the affairs and business of said defendant Quaker Oats Company, and said Cereal Company, as the result and by means of which the competition then and there existing between said companies was to a large extent restricted, and the aforesaid interstate trade and commerce of the said Cereal Company was to a large extent hampered and curtailed, and the aforesaid interstate trade and commerce of said Quaker Oats Company was considerably extended and enlarged, and that prices at which the cereal products dealt in by said respective companies in interstate trade and commerce as aforesaid were fixed and controlled, and in and by which certain confidential employés of said defendant Quaker Oats Company were employed by and entered into the employment of said Cereal Company, and thereby acquired a complete and intimate knowledge of the business and affairs and financial condition of such Cereal Company, which said information was then and there communicated by said last-mentioned employés to said defendant Quaker Oats Company, its officers and agents."

(9) The defendant Joy Morton, between April 30, 1904, to June 22, 1911, "in furtherance of said conspiracy" and with a knowledge and concurrence of his individual codefendants, "diverted various large sums of money belonging to said Cereal Company from the proper corporate purposes of said Cereal Company, and applied the same to the payment of illegal dividends upon preferred stock, illegal salaries to various officers of said cereal company, and illegal commissions and perquisites to him, the said defendant Joy Morton," aggregating $400,000, by reason whereof "all other illegal practices" the Cereal Company, from April 30, 1907, to June 22, 1911, "was prevented from earning the profits which it would otherwise have derived from its aforesaid trade and commerce, and "was

compelled to and did conduct its aforesaid business at a loss, whereby the said Cereal Company was compelled to and did borrow large sums of money at high rates of interest with which to conduct its aforesaid business, and was compelled to and did pay the said Joy Morton large and extortionate commissions for the procurement of said loans, by means whereof the capital and resources of said Cereal Company were on the 30th day of April, 1911, seriously impaired, and the said Cereal Company became unable to meet its maturing obligations in the due course of its business, and was rendered powerless further to compete with the said defendant or Quaker Oats Company in the aforesaid trade and commerce, * * * as the said defendants on the 22d day of June, 1911, or shortly prior thereto, well knew."

(10) That the defendants, to take advantage of the impoverished condition last above noted, and in order to transfer the valuable good will and interstate trade of said Cereal Company to said Quaker Oats Company, on June 22, 1911, "combined, confederated, and agreed together to entirely eliminate" the pre-existing competition between the said companies in the manner indicated, viz.: On June 20, 1911, the Cereal Company being circumstanced as above stated, and "incapable of further carrying on its" business by reason of "the various unlawful agreements and acts of the said several defendants," the latter (group 4) "at a special meeting of the board of directors of said Cereal Company then and there convened for that purpose, and while acting in said meeting as directors of said Cereal Company, adopted a certain resolution to the effect that in the judgment of the board of directors * * * it was for the best interests of said company to discontinue the manufacture and sale of oatmeal, rolled oats, crushed oats, and mixed feeds, containing by-products as an ingredient, and to dispose of that portion of the business of said Cereal Company and all assets pertaining thereto, * * * and a certain other resolution that the said Cereal Company had decided to discontinue the manufacture of 'said last-mentioned products,' and that in the judgment of said board of directors the property in said resolution and said contract dated June 22, 1911 (to be referred to), more particularly described, was no longer either useful or necessary to said Cereal Company and could not be advantageously used in its business"; that thereafter, and without the knowledge or consent of the stockholders of said Cereal Company,

other than said defendants (group 4, supra), the latter caused the company to enter into a contract with the defendant Quaker Oats Company (to be referred to); that at said time all of the shares of the capital stock of the Cereal Company were issued and held, the defendants comprising group 4 having approximately 10,000 of the 145,000 shares of stock; that such defendants "in furtherance of the said conspiracy" concealed from the stockholders of said Cereal Company "their intention to abandon the aforesaid business and to make, execute, and deliver the contract between the Cereal Company and the Quaker Oats Company, and their intention to sell and transfer the properties, good will and business of the Cereal Company which became the subject-matter of said contract; that in order to carry out such purposes the defendants "contrived to and did obtain proxies from the stockholders of said Cereal Company to be voted at a general meeting of said stockholders, and for the purpose of procuring colorable authority for said transfer from the stockholders, a meeting was convened on June 21, 1911, at which two of the defendants named were the only stockholders present in person, and at such meeting they voted the proxies in favor of the ratification of the proposed sale of the Cereal Company's business and property to the Quaker Oats Company.

(11) Pursuant to the resolutions and ratifications thereof passed by the board of directors and shareholders as last above noted, and pursuant to the contract referred to, the Cereal Company executed conveyances and bills of sale, whereby the property, which was the subject-matter of such resolutions and contract, was transferred and delivered to the Quaker Oats Company by the Cereal Company. The declaration continues: " * * * That the said Cereal Company has not since the 22d day of June, 1911, in any way or to any extent, directly or indirectly, interrupted or interfered with the said business and good will so transferred by said officers and directors of said Cereal Company to said defendant Quaker Oats Company, or with the full, free and complete exercise and enjoyment thereof by said Quaker Oats Company, nor has it been able so to do, nor has said Cereal Company since the 22d day of June, 1911, done or performed or licensed the doing or performing of any act or deed which would in any way impair the value of the aforesaid good will and business, nor has it been able so to do." The transfer so effected constitut-

ed 95 per cent. of the total business and trade of the Cereal Company, and "said Cereal Company by reason thereof was then and thenceforth unable to continue any business whatsoever, and then and there, to wit, on June 22, 1911, became and was and has since remained insolvent."

(12) The formal allegation of injury "in its business and property to the extent of the value of its aforesaid trade and good will, including its aforesaid trade and commerce in oatmeal and other cereal products and by-products," in the sum of $3,000,000, is the concluding matter of fact contained in the declaration.

(13) The appointment of receivers for the Cereal Company on May 13, 1912, by the Court of Chancery of New Jersey, because of insolvency and suspension of ordinary business, is averred.

(14) The contract dated June 22, 1911, is a formal instrument reciting a consideration of $10 and other good and valuable considerations; the Cereal Company being designated as the first, and the Quaker Oats Company as the second, party. It detailed, either in the body of the contract or in annexed schedules, the particular property, property rights to be transferred and delivered, and the manner of ascertaining and fixing the valuation thereof agreed to be paid as a consideration by the Quaker Oats Company. It suffices to note here the admission found in the declaration that, after the execution of such contract, the consideration moving from the Cereal Company was delivered and accepted, and the further fact, to be inferred (it was conceded on oral argument), that the consideration to be met by the Quaker Oats Company was likewise paid to, received, and retained by the Cereal Company.

Demurrers to the declaration were sustained; and, the plaintiff electing to stand upon the declaration, judgment dismissing the same was entered, and is here for review upon writ of error.

Albert G. Welch, of Chicago, Ill., for plaintiffs in error.

John M. Zane, of Chicago, Ill., for defendants in error.

Before BAKER and EVANS, Circuit Judges, and GEIGER, District Judge.

GEIGER, District Judge (after stating the facts as above). Although the declaration contains several counts, the foregoing statement presents the questions arising upon this writ of error. The matters comprehended may be grouped as follows:.

(a) The general historical allegations respecting a confederation, combination, pool, monopoly, or attempted monopoly, in the business of oatmeal products, etc. They deal with a situation said to have existed many years prior to the advent of the Cereal Company.

(b) General allegations or charges that "the defendants" combined, confederated, conspired, etc., to restrain interstate commerce in oatmeal products and by-products or to create a monopoly.

(c) General allegations that the defendants entered into "certain agreements" to effectuate the purpose noted in (b) supra.

(d) Allegations of misconduct or misfeasance on the part of certain defendants, officers of the Cereal Company; e. g., the diversion of funds for "illegal salaries," "illegal" dividends, loans to the Cereal Company at high rates of interest, and upon which "extortionate commissions" were exacted.

(e) Allegations respecting the making of the contract of June 22, 1911, between the Cereal Company and the Quaker Oats Company.

[1-3] Of these groups of allegations it may be observed that mere general charges of combination or conspiracy avail nothing, unless and until there is averred the commission of an act or acts denounced by the statute as conferring a right to ensuing damage. Conceding, therefore, that the declaration by mere general allegation shows the existence—prior to the advent of the Cereal Company—of some sort of a confederation or combination to monopolize or restrain interstate trade, the plaintiff is not helped thereby since, as shown by the declaration, the Cereal Company came into existence, acquired, and for a long period maintained, a position as a competitor. Hence the necessity of averring an act or acts, prohibited by statute, thereupon committed, which, upon commission, injured the business of the Cereal Company, and which then availed it, and now avails its successor or representative, as a basis for claiming the damage shown to have ensued. So, too, the allegations respecting the embarrassment of the Cereal Company, the payment of "illegal" salaries, the declaration of "illegal" dividends, the making of loans at high rates of interest, the exaction of "commissions" by an official of such company for "procuring such loans," are of no relevancy, in point

of pleading, to support a right of action under the statute. If true, they disclose acts of official delinquency occurring within the corporation—not germane to the statutory bases—and cannot be made more relevant or germane, nor given other color, by introducing them under averments that the acts were committed "in furtherance of the said conspiracy," or that the defendants "taking advantage" thereof, or the consequences thereof, committed other acts. So the case is reduced to the allegations dealing with the contract of June 22, 1911 (e supra); and this necessitates consideration of such contract (1) standing alone, or (2) as a consequence or step in an alleged conspiracy, or (3) in the light of its own alleged consequences.

[4] If, in a competitive business, one agrees to sell out the whole, or part thereof, and its incidentals, the law does not contemplate that he bargains for such advantages only as are certain of actual receipt and fruition; that he does not bargain for consequences which may prove disadvantageous or disappointing in the future; that therefore he may accept and receive the benefits and endeavor to treat ensuing burdens, disadvantages, or disappointments as injury to his business, causing legal damage, simply because by reason of his own participation the act has resulted in restricting the status hitherto held by him as a competitor. Section 7 of the Anti-Trust Act (Comp. St. § 8829) does not intend that one competitor may conspire with another, to the end that each—if disaster overtake one or all—may insist that the others did him an injury and should stand for damage. The section does not and cannot serve as a means of disavowing, yet holding benefits arising upon, agreements formally and deliberately entered into.

The drafter of the pleading before us appears to have appreciated these elementals, and seeks to avoid their application thus: The agreement was entered into as a formal corporate act; the officers sanctioned and signed upon authorization or ratification by shareholders. But—so it is said the latter did not know that, at the stockholders' meetings, the votes cast by proxy were to be cast favorably to the transaction now complained of; and all this when, as averred, the corporation had become "incapable (by 'reason of the various unlawful agreements and acts * * * in this count mentioned') of further carrying on its aforesaid interstate trade and commerce," and also when defendants "as directors of

said Cereal Company" had resolved that in "the judgment of its [Cereal Company's] board of directors" the property described "was no longer useful or necessary to said Cereal Company, and could not be advantageously used in its business, or in the proper and judicious operation, management and maintenance thereof." So at the threshold plaintiff appreciates that the contract—executed and carried out with the conceded formality and express assent detailed—evidences corporate assent to and participation in an act, admitted to be the sole act, or the culminating one of a series, without which no claim of injury or damage is assertable. Therefore the declaration is made to disclose a conception of means of evading this assent to avoid what, under familiar principles, bars recovery; and it is averred that defendant directors "concealed" from the shareholders "their intention" to "abandon the aforesaid business," to make the contract, and to convey the property, etc. This, so it is urged, is adequate to show the absence of knowledge on the part of shareholders, therefore want of assent on their part, and therefore also want of corporate assent to the act. The corporation, as an entity, is asserted to have been a victim, not a voluntary participant, and the act is broadly characterized as "unlawful," "illegal," and ultra vires.

The contract, judged as well by what it does not as by what it does, contain, prima facie is neither illegal nor ultra vires. It contemplates transfers of properties, with incidentals, for considerations, which we must presume were met, which transfers are not only within the ordinary power of a corporation, but may be clearly within the duty of its administrative officers to exert, when, as here alleged, the corporation had become incapable of continuing its business, and was on the verge of self-extinction, necessitating liquidation (or its equivalent) of its affairs. Here, again, the pleading is not helped by a mere general allegation that the Cereal Company had been reduced to this situation by various "unlawful acts," none of which, as noted, were or are anything other than acts of delinquency within the corporation itself. Therefore, viewing the contract as within the Cereal Company's corporate power to make, and under which it accepted and retained, and the plaintiff as its successor now retains, large benefits, its avoidance—and the plaintiff seems to think some sort of avoidance necessary—cannot be encompassed except through recognized processes available in equity for

rescission, cancellation, or the like. The alleged want of knowledge on the part of a majority of shareholders that their proxies were to act as they did act certainly does not lay the transaction open to be ignored as void in contravention of public policy, and not merely voidable at the election of the corporation. If the corporation—as an impersonal entity—was caused affirmatively to act upon such alleged want of knowledge of the shareholders in the same manner as it might have acted upon their majority or unanimous vote with full knowledge, the act, as a corporate act, none the less stands, and even in equity must stand, so long as, by silence or by acquiescence, the corporation allows it to stand. Thus it would seem that the mere allegation that shareholders gave their proxies, having "concealed" from them the intention of the directors or the proxy holders, to vote in favor of the contract which was in fact entered into, is not at all germane or relevant to establish the commission of an act denounced by the statute and which injured the business of the corporation. The corporation itself would be remanded to equity before it could be heard to say that the contract was improvident or the like; in no event—nowhere—could be heard to assert that it made an illegal contract as a "victim," but desired to stand thereon and recover damages claimed to have been suffered in excess of benefits which it received and retains. We assume that it would not be contended that the corporation, merely because of its impersonal character, could insist—if the act is shown to be illegal—that it would not be binding, and hence as such impersonal entity, it could not and did not assent to it; or, putting it in another way, that it could always insist that the act of its officers and shareholders, whether the latter act by majorities or unanimously, was in violation or derogation of its legal obligation, and hence in the eyes of the law, it did not, because it could not, assent.

[5] Therefore the declaration before us can be taken as disclosing a purpose to show that the corporation did not assent, merely because a majority of its shareholders did not in fact know that at the meeting referred to a resolution of ratification, therefore of authority, was to be passed. It may be noted that it is nowhere suggested that the shareholders, in granting proxies, did not intend fully to endow the proxy holders with authority to act in a meeting duly convened upon any matter competently brought before the meeting; much less does it intimate that the action, having been taken, was and is in contravention of the actual sentiment of the shareholders. Disregarding, therefore, the fact that plaintiff is pursuing a statutory remedy requiring a case to be brought clearly within statutory terms, the allegations of the declaration do not support the claim that the corporation, upon the promptings of what was done at a meeting duly convened, did not assent to the act complained of. The statement, as a fact, of "concealment" of an "intention" to transact certain business at a shareholders' meeting, is not a violation of any right of a shareholder who gives a proxy broad enough to transact the particular business complained of. And this requires no other or further assumption, except that it be business competently coming before the meeting. Again, if the rights of the shareholders or of the corporation were violated because the contract was illegal, wherefore the act of ratification is illegal, then the alleged concealment of the "intention" to vote shares favorable to ratification becomes immaterial. The "ratification" and the "contract" would have remained just as illegal, had the vote been cast upon full disclosure of the "intention," and likewise, in legal aspect, the "assent" of the corporation, in either case, would be the resultant. There may be a question whether such assent might be more easily avoidable in the one than in the other case, but in either the fact of assent is present.

Upon these considerations, the case as shown by the declaration is reduced to these alternative hypotheses:

(1) That the act—conceded to be the culminating act—of entering into the contract affirmatively appears from the declaration to have been within the power of the corporation, upon lawful considerations, to do, and therefore is not and cannot be made an act or "instrumentality" within the statute which produced legal damage. Geddes v. Anaconda Copper Co., 254 U. S. 590, 41 Sup. Ct. 209, 65 L. Ed. 425; Keogh v. Chicago, etc., Ry. Co. (C. C. A.) 271 Fed. 444, affirmed 260 U. S. 156, 43 Sup. Ct. 47, 67 L. Ed. 183.

(2) That the act of entering into the contract, if it was unlawful and produced damage, is shown by the complaint to have been a voluntary wrongful participating act of the corporation Cereal Company, and, being such, bars recovery Eastman Kodak Co. v. Blackmore, 277 Fed. 694, 698, 699 (C. C. A. 2d); The Florida, 101 U. S. 37, 43, 25 L. Ed. 898; Sage v. Hampe, 235

U. S. 99, 105, 35 Sup. Ct. 94, 59 L. Ed. 147; Harriman v. Northern Sec. Co., 197 U. S. 244, 295, 296, 298, 299, 25 Sup. Ct. 493, 49 L. Ed. 739; Gibbs v. Baltimore Gas Co., 130 U. S. 396, 405, 406, 9 Sup. Ct. 553, 32 L. Ed. 979; Victor Talking Mach. Co. v. Kemeny, 271 Fed. 810, 816 (C. C. A. 3d); Bluefields S. S. Co. v. United Fruit Co., 243 Fed. 1, 18, 155 C. C. A. 531 (C. C. A. 3d); Bishop v. American Preservers Co. (C. C.) 105 Fed. 845, 846.

We need but add, in connection with the second hypothesis, that if the alleged cause of action has the infirmity noted, and assuming that a cause of action under section 7 might be assertable by a receiver, his status does not free the alleged cause of action, which the corporation may have attempted to assert, of its fatal infirmities.

The judgment is affirmed.

Judge BAKER approved of this opinion, but died before it was announced.

Judge EVANS approves of the conclusion reached.