### WM. FILENE'S SONS CO. v. FASHION ORIGINATORS' GUILD OF AMERICA, Inc., et al.

#### No. 4293.

District Court, D. Massachusetts.

March 24, 1936.

Jacob J. Kaplan and Nutter, McClennen & Fish, all of Boston, Mass., for plaintiff.

Ropes, Gray, Boyden & Perkins and Charles B. Rugg, all of Boston, Mass., for defendants.

BREWSTER, District Judge.

This bill in equity is brought under section 16 of the Clayton Act (title 15 U. S.C.A. § 26), the plaintiff seeking injunctive relief against threatened loss and damage by violation of the anti-trust laws. The matter is before the court upon plaintiff's prayer for a preliminary injunction. It has been heard upon affidavits, filed on

behalf of both plaintiff and defendants, upon which I base the following

### Statement of Facts.

1. The defendant Fashion Originators' Guild of America, Inc. (hereinafter referred to as the Guild), is a New York corporation. A copy of the certificate of incorporation which issued March 7, 1932, together with a copy of its constitution and by-laws and certain rules and regulations adopted by the Guild, are attached to the affidavit of James M. Golby, its executive secretary. (These exhibits and all exhibits hereinafter referred to are by reference incorporated in this statement of facts.) The other defendants are members of the Guild, manufacturers of ladies' garments.

The purpose of the corporation, as shown in its certificate of incorporation and its by-laws, is to "protect the originators of fashions and styles against copying and piracy of styles of any trade or industry; to promote co-operation and friendly intercourse in the wearing apparel industries; to establish and maintain uniformity and certainty in the customs and commercial usages of trade; * * * to advance the trade and commercial interests of its members and to foster the industries of its members throughout the Americas and to promote the sale, identification and recognition of original style and merchandise of the industries of its members."

2. Prior to the organization of the Guild, the manufacturers of ladies' garments, particularly in the higher priced lines, had been confronted with a demoralizing and destructive practice in the trade, known as "style piracy." Manufacturers who produced original designs, oftentimes at considerable expense, were liable to have the value of the accepted style seriously impaired by pirating manufacturers or retailers who obtained copies of the garment and manufactured, or caused to be manufactured, replicas made of cheaper material and of inferior workmanship which were sold in the market at a price much less than the originator was entitled to command for the original creation. This piracy was sometimes accomplished by means that could be said to violate no legal rights of the creator, but in many instances reprehensible methods were adopted by the pirating manufacturer. In either event, the piracy worked a substantial injury to the manufacturer who created the style. During 1930 and 1931 it was not unusual to find that a dress, sold by the originator for $89, or thereabouts, would be copied and sold by the pirating manufacturer for as little as $15.75. It is said that this pernicious practice of piracy contributed substantially to the demoralized condition of the industry in 1931 and 1932, resulting in the bankruptcy of many concerns engaged in original style creation.

This practice of pirating styles was especially detrimental to the dress industry by reason of the fact that the style life of a dress is relatively short. If a pirating manufacturer were able to place copies on the market at reduced prices at approximately the same time as the original creator, obviously the latter would be deprived wholly, or partially, of any opportunity to make an advantageous sale of the pirated article.

The chief value of a "quality" dress lies, not so much in the quality of the material, as in the smartness and originality of the design.

The ladies' ready-to-wear garment industry is divided into various classes according to the price ranges of the articles produced. For some years prior to the formation of the Guild, a more or less arbitrary line had been drawn dividing the manufacturers of garments selling at wholesale for $16.75 and up from those manufacturers who sold for less. Since the formation of the Guild, however, this line of division, by common usage and custom, has been constantly lowered, so that since the summer of 1935 the definition of "original creators" has been held to include those who produced merchandise selling for as low as $6.75.

The manufacturers of low priced dresses, generally speaking, do not create original styles but adapt or change existing styles. Some years ago the cheaper market copied most of its styles, but this predatory practice was decreased so that to-day, in proportion to the total production, relatively few garments are copied. The bulk of the copying now existing is found largely in the low priced field.

Pirating not only caused loss to the manufacturer and to the retailer who had been compelled to meet competition of retailers who bought from pirating manufacturers, but it caused resentment against the retailing store among the customers who had purchased the original garment at the higher price.

3. In order to remove, or at least mitigate, this evil, the Guild was organized

to the end that the manufacturers of original styles could better protect the fruits of their labor.

The methods adopted by the Guild and its members to meet this situation may be summarized as follows:

In order to secure the necessary co-operation of the retail trade, though they were not admitted to membership in the organization, the retailers were asked to sign a so-called "declaration of co-operation" against style piracy. A copy of the original declaration is attached to the affidavit of Golby as Exhibit D. Retailers are not obliged to subscribe to this declaration, but if they do they agree to recognize the property rights of the manufacturer in styles created by it and to exact from the seller a warranty that the goods covered by the order are not copies of dresses originated by members of the Guild. The retailer further agrees that he will not knowingly or intentionally sell copies of Guild merchandise, and upon notification by the Guild he will exercise his right to return the garment to the manufacturer pursuant to the warranty above noted.

If a retailer declined to subscribe to this declaration of co-operation, or failed to comply with its provisions, the members of the Guild were so advised. The rules provide that members shall neither show nor sell their garments to retailers who have not signed or agreed to the declaration of co-operation, or, having signed, have breached its terms, and any member who willfully sells to a retailer after such member has been duly notified that such dealer has violated the "fair and reasonable standards and ethics of the Guild" is liable to an assessment of $100 for the first offense; $500 for the second, or expulsion or both; and for the third offense the member is liable to expulsion.

There were provisions in the by-laws for arbitration of disputes arising among members and, by an amendment to the by-laws, members, after eight weeks' notice in writing, were free to resign, in which event the member was required to state, before the board of governors, the reasons for his resignation.

4. To facilitate the operation of the program adopted by the Guild, it created a Style Registration Bureau and required each member, in order to secure the benefits of protection, to register each design with the bureau prior to releasing his dress

for sale to the general public. A label was issued to him bearing the following legend, "This dress is a registered style of the Fashion Originators' Guild of America, Inc.," which label was attached to dresses manufactured by the original creators in accordance with the registered design. In the course of time, this label came to have a definite significance as indicating that the dresses bearing the label represented quality merchandise manufactured according to original designs by skilled workers. The Guild, in order to protect original designs of manufacturers who were not members, refused to register and issue labels to a member for any dress which was shown to be a copy of a dress created by a nonmember. Only original designs were eligible for registration.

Under the by-laws, the regulations, and practice of the Guild, so-called piracy committees have been set up composed of conforming retailers and, if any question is raised whether a dress is a copy of an original style, the dispute is referred to this committee who, after hearing and full investigation, determines whether the alleged copy is, in fact, a copy.

There is nothing in the affidavits to indicate that this administrative system of arbitration before the piracy committee has worked arbitrarily or unfairly to co-operating retailers. If the board of arbitration has determined that the article is a copy, the retailer is advised of the fact and requested to return the pirated copy to the manufacturer pursuant to the provisions of its warranty. If the retailer declines to comply, the members of the Guild are advised by means of a "red card," so called, of this violation on the part of the retailer. The member, after receipt of such information, then must refuse to sell any original registered design to the nonco-operating retailer or be subjected to the penalties above described.

5. At the outset approximately 2,500 retailers signed declarations of co-operation. Up to July 1, 1935, a total of approximately 6,000 retailers had signed and, as the influence of the Guild was extended to lower priced lines, the number of retailers joining increased to approximately 11,000 stores which are now acting in conformity with the spirit and purpose of the Guild.

6. In addition to style piracy, the Guild endeavored by formulating a code of fair trade practice to eliminate other practices which the industry deemed to be highly

detrimental and inimical to their interests and the interests of the retail trade and consuming public as well. This code concerned itself solely and entirely with the eradication of unfair and excessive discounts, unwarranted returns of merchandise and cancellation of contracts, rebates by manufacturers to retailers, and subsidies exacted from manufacturers by retailers in the form of advertising and other evils which ran rife in the industry.

7. None of the measures adopted by the Guild to effectuate its purpose involved any attempt to regulate price, or control production, or allocate business between its members or their customers.

8. Plaintiff, in 1933, indicated its intention to co-operate with the Guild but with certain reservations which, after explanation, were found acceptable by the Guild. Copies of letters of June 29, 1933 (Exhibit H), and July 5, 1933 (Exhibit J), from plaintiff to the Guild, and letters of July 1, 1933 (Exhibit I), and July 7, 1933 (Exhibit K), from the Guild to the plaintiff, are incorporated with this statement by reference. (Exhibits referred to are attached to the affidavit of Golby.) Subsequently, plaintiff by other acts demonstrated its full approval of the aims and purposes of the Guild and the measures adopted to attain them.

9. In February, 1936, having received notice that copies of registered style dresses were being sold by R. H. White Company, a 100 per cent. subsidiary of the plaintiff, a representative of the Guild investigated and found such copies at White's and at one other store. Later, other copies appeared in the stores of Jordan Marsh Company and Chandler & Co., and upon being advised of the piracy these were all returned to the manufacturer. R. H. White & Co. refused to comply with this request. On or about February 7, R. H. White & Co. was requested to sign a formal declaration of co-operation, a copy of which is attached as an exhibit to the affidavit of Edward J. Frost (filed March 12, 1936).

R. H. White & Co. refused to sign this declaration, whereupon the Guild caused to be sent to its members the so-called "red card," and shortly thereafter plaintiff wrote to members, who had accepted orders for dresses, threatening suit if the orders were not filled. To other members it gave notice that its relationship with the Guild had ended and asked whether it might resume business relations with such members. It received many replies, all substantially in the following language:

"We have been advised by our attorneys that a repudiation of your signed declaration of cooperation constitutes a breach of your basic agreement with the Fashion Originators' Guild, of which we are a member, and therefore, with us, and that we are justified in refusing to ship merchandise to you based upon such repudiation until such time as you may enter into a new agreement with the Guild and its members."

On February 27, 1936, the plaintiff wrote the Guild as follows:

"We have just been advised by our counsel that recent action on your part is clearly illegal and that for us to have any cooperation with you might subject us to the charge of cooperation in illegal activities. You will please note accordingly that there are to be no relations between us and the Guild or any of its members or those cooperating with the Guild in its activities."

10. The facts above recited are supported by affidavit and seem not to be seriously challenged by the parties.

There is, however, a sharp issue of fact respecting the extent to which the Guild, its members and affiliates, dominated the industry. The merchandise manager of the plaintiff has made affidavit that 75 per cent. in value of women's, 85 per cent. of misses', and 90 per cent. of juniors' daytime dresses, made in New York, are manufactured by the members of the Guild. It is impossible to reconcile these estimates with figures based on the reports appearing in affidavits offered on behalf of the defendants, unless there is some special significance to be given to the word "daytime," which renders a comparison impossible.

According to the reports of Harris & Serwer on the industry for 1934, which reports were widely distributed, the total money value of the volume of business of manufacturing ladies' garments from the lower prices to the highest was approximately $430,000,000. The value of the products sold at prices over $6.75 was $176,000,000, or about 40 per cent. of the aggregate total, of which the Guild members manufactured 30 per cent., or about $67,725,000. The value of the product priced between $6.75 and $16.75 was $133,000,000, or about 30 per cent. of the total, of which the Guild members manufactured

33 per cent. or about $44,088,000, and the value of products priced over $16.75 was $43,000,000 or 10 per cent. of the aggregate total, of which the Guild members manufactured 55 per cent. or about $23,639,000.

Moreover, although New York is undoubtedly the principal market for ladies' garments, there are supplementary markets in Philadelphia, Chicago, Los Angeles, Boston, and several other large cities; the more important being Chicago and Los Angeles. In both of these cities the plaintiff maintains buying agencies. Of the total number of concerns in New York manufacturing garments at wholesale, sold at prices of $16.75 and up, the Guild members constituted only 40 per cent. In the group between $16.75 and $10.75 there are 286 manufacturers in New York, of whom only 19 per cent. are Guild members. Below $10.75 there are 272 manufacturers, of whom only 14 per cent. are Guild members. And in Chicago, of 300 manufacturers the Guild has only 6 members; in Los Angeles, with 200 manufacturers, only one is a member of the Guild.

Attached to the affidavit of Golby as exhibits were copies of advertisements, put out by the plaintiff, showing California-made ladies' garments, indicating that the plaintiff availed itself of the Los Angeles market.

11. At the hearing before me the defendant Guild expressed its willingness to consent that all orders placed by the plaintiff with Guild members might be filled, and in accordance with this understanding the members have been so advised.

### Conclusions of Law.

In this suit plaintiff is seeking injunctive relief from loss resulting from violation of the anti-trust laws (38 Stat. 730) and, pending final disposition of the matter, it asks that a preliminary injunction may issue.

By the express terms of the statute (15 U.S.C.A. § 26), such an injunction may not issue except upon the execution of a proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate. The plaintiff, neither in its pleadings or its argument, has offered to comply with the provisions of the statute respecting a bond; and I entertain serious doubts whether whatever loss, or damage, may result from the acts of the defendants, is so irreparable and immediate as to justify a preliminary injunction.

However that may be, it seems to me that the controlling issue presented on the facts established is whether there has been a violation of sections 1 and 2 of the Act of July 2, 1890, known as the Sherman Anti-Trust Act (15 U.S.C.A. §§ 1 and 2). If there is no violation, the plaintiff is not entitled to relief and it necessarily follows that, in these circumstances, its prayer for preliminary injunction must fail. I have, therefore, deemed it advisable to set out the facts disclosed in the affidavits with extraordinary particularity in the belief that, if the plaintiff seeks a review by the Circuit Court of Appeals, that court, upon the record, will be able to adjudicate upon the legality of the measures adopted by the Guild to stamp out what it deems to be a pernicious practice in the ladies' garment industry.

The contention of the plaintiff is that the provisions of the by-laws and rules and regulations of the Guild, relative to the issuing of red cards to its members, and the duty of the members to refrain from dealing with the plaintiff except upon condition that it will subscribe to the declaration of co-operation, constitute an illegal restraint of trade in interstate commerce and, therefore, falls within the condemnation of the Sherman Act. It objects to that requirement of the declaration which provides that the co-operating retailer will accept as final the decisions of the impartial piracy committees as to whether or not garments are copies.

Certain propositions of law must, I think, be conceded at the outset. A manufacturer who puts upon the market for sale an original design of a ladies' garment cannot maintain any exclusive property rights in the design. Cheney Bros. v. Doris Silk Corporation (C.C.A.) 35 F.(2d) 279; Keystone Type Foundry v. Portland Pub. Co. (C.C.A.) 186 F. 690; Flagg Mfg. Co. v. Holway, 178 Mass. 83, 59 N.E. 667.

If, however, the copies are obtained by questionable methods, so that the act of the copyist would be deemed to be unfair competition, the courts will intervene to protect the originator against such unwarranted invasion of his rights of proprietorship in what he has produced. Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502; Board of Trade of Chicago v. Christie Grain & Stock Co., 198 U.S. 236, 25 S.Ct. 637, 49 L.Ed. 1031; International News Service v. Associated Press, 248 U.S. 215,

39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293; A. L. A. Schechter Poultry Corporation v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947.

■ It is equally true that the decision in the case at bar cannot turn upon motives or purposes however commendable may be the motives, or however desirable the purposes. If the acts and measures adopted to accomplish these purposes come within the purview of the anti-trust laws, they must be declared to be illegal. Thomsen v. Cayser, 243 U.S. 66, 37 S.Ct. 353, 61 L.Ed. 597, Ann.Cas.1917D, 322; Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788; Paramount Famous Lasky Corporation v. United States, 282 U. S. 30, 51 S.Ct. 42, 75 L.Ed. 145.

■ On the other hand, not every combination or contract which operates to restrain trade in interstate commerce is to be condemned.

In Board of Trade of City of Chicago v. United States, 246 U.S. 231, at page 238, 38 S.Ct. 242, 244, 62 L.Ed. 683, Ann.Cas. 1918D, 1207, Mr. Justice Brandeis said:

"Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences."

That knowledge of actual intent will aid in the interpretation of facts and prediction of consequences was recognized in the more recent case of Appalachian Coals, Inc., v. United States, 288 U.S. 344, 372, 53 S.Ct. 471, 479, 77 L.Ed. 825.

It was not until the views of the minority in earlier cases had become the views of the majority, in Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.(N.S.) 834, Ann.Cas. 1912D, 734, that the so-called "rule of reason" was applied to the interpretation of this statute.

It was developed in the opinion of Chief Justice White in the Standard Oil Company Case that the Sherman Anti-Trust Act was directed at evils which, both in England and in the United States, had come to be regarded as inevitable consequences of monopoly. Respecting these evils, he said (221 U.S. 1, at page 52, 31 S.Ct. 502, 512, 55 L.Ed. 619, 34 L.R.A.(N.S.) 834, Ann. Cas.1912D, 734):

"The evils which led to the public outcry against monopolies and to the final denial of the power to make them may be thus summarily stated: (1) The power which the monopoly gave to the one who enjoyed it, to fix the price and thereby injure the public; (2) The power which it engendered of enabling a limitation on production; and (3) The danger of deterioration in quality of the monopolized article which it was deemed was the inevitable resultant of the monopolistic control over its production and sale."

He also said (221 U.S. 1, at page 56, 31 S.Ct. 502, 514, 55 L.Ed. 619, 34 L.R.A.(N. S.) 834, Ann.Cas.1912D, 734) that the freedom to contract and to abstain from contracting and to exercise every reasonable right incident thereto became the rule in the English law except that no right existed to restrain the free course of trade by contracts or acts which implied a wrongful purpose.

In the cases where the court has struck down combinations as violative of the Sherman Act, such as American Column & Lumber Co. v. United States, 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284, 21 A.L.R. 1093; United States v. American Linseed Oil Co., 262 U.S. 371, 43 S.Ct. 607, 67 L.Ed. 1035; Eastern States Retail Lumber Dealers' Ass'n v. United States, supra, there were involved combinations which not only tended toward, but actually achieved, the accomplishment of one or more of the resultant consequences of monopoly.

It is therefore established, as stated in Nash v. United States, 229 U.S. 373, 376, 33 S.Ct. 780, 781, 57 L.Ed. 1232, that "only such contracts and combinations are within the act as, by reason of intent or the inherent nature of the contemplated acts, prejudice the public interests by un-

duly restricting competition or unduly obstructing the course of trade."

■ Applying this test, it would seem to be material to inquire whether the objects and purposes of the Guild are prejudicial to the public interest, and whether in the pursuit of those objects it had resorted to measures which unduly restrained interstate commerce.

That the aims of the Guild were calculated to benefit rather than prejudice public interest, I think is not open to debate.

It is equally apparent that the means adopted to effectuate this purpose do not involve any attempt to enhance prices or to curtail or cheapen production. Neither the purposes or measures, therefore, lead to any of the recognized evils of monopoly. The question is whether the coercive influences exerted upon the members directly, and indirectly upon conforming retailers, unduly restrain the free flow of trade to the extent that it can be said that the interests of the public are prejudiced in any way.

Undoubtedly manufacturers, so long as they are members of the Guild, voluntarily submit to restrictions upon their right to sell to nonconforming retailers. Subject to this limitation, they are entirely free to compete among themselves, and I am unable to discern any unlawful suppression of competition in interstate commerce intended, or effectuated, by the plan adopted for their protection against piracy. If any manufacturer is unwilling to have his freedom thus abridged, he is at liberty to resign from the Guild upon reasonable notice.

■ Approaching the question from the viewpoint of the plaintiff, it has not been denied the opportunity to co-operate with the Guild and secure the benefits accruing from such co-operation. If it is not willing to conform to the standards of commercial ethics prescribed by the rules of the Guild, of course it follows that certain avenues of trade are closed to it, but we have seen that, in New York alone, only 40 per cent. of manufacturers of ladies' dresses are members of the Guild, and of the better quality dresses Guild members manufactured only 55 per cent. in 1934. It is apparent, therefore, that there are open to plaintiff many other avenues. This involves no denial or abridgement of the right of fair competition. The right to compete by unfair means I assume is not a

right which the anti-trust laws were designed to protect. No public interest can be served by such protection. The activities of the Guild present to the retailer a choice. He may choose to retain his full freedom to sell pirated articles, or he may take the other course and consent to rules adopted by the trade for the purpose of abating the evil of piracy.

■ It may be necessary, in order to purify the flow of trade, to impose some restraints upon those who enter it, but when such restrictions are not arbitrary or unreasonable they cannot be regarded as the undue restraint of interstate commerce contemplated by the act.

The activities of the Guild were before the New York Supreme Court, Appellate Division, in Wolfenstein v. Fashion Originators Guild of America, Inc., 244 App. Div. 656, 280 N.Y.S. 361. There it was held that the operations of the Guild did not constitute a violation of the state anti-trust law, known as the Donnelly Act (section 340 of General Business Law). The court observed that the members of the association had the right to co-operate for the purpose of correcting abuses or to stabilize the industry, provided their endeavors did not amount to an unlawful boycott or constitute an unreasonable restraint of trade; that there was nothing arbitrary, unreasonable, or unduly in restraint of trade in the arrangement which prohibited sales by members of the Guild to dealers who engaged in practices which were inimical to the trade.

I find nothing inconsistent between the conclusions reached by the learned court in New York and decisions of the United States Supreme Court, dealing with combinations in restraint of trade.

Anderson v. United States, 171 U.S. 604, 19 S.Ct. 50, 55, 43 L.Ed. 300, was a case where a trade association was formed among the traders in livestock in the Kansas City yards. There was no attempt to control prices or methods of sale. There were drastic regulations as to the methods and manner of conducting business, and one was that no member of the association could do business with any trader who was not a member; and in order to make effective that regulation the association sent to its members a list, similar to the red card of the Guild, designating those who were not members, and prohibiting trading with them. The court found nothing un-

lawful in the design of the trade association to bring all the yard traders into the association as members, in order that they might be compelled by its rules and regulations to transact business in an honest and straightforward manner.

In the course of its opinion in that case, the court made the following observations:

"If while enforcing the rules those members who use improper methods or who fail to conduct their business transactions fairly and honestly are disciplined and expelled, and thereby the number of members is reduced, and to that extent the number of competitors limited, yet all this is done, not with the intent or purpose of affecting in the slightest degree interstate trade or commerce, and such trade or commerce can be affected thereby only most remotely and indirectly; and if, for the purpose of compelling this membership, the association refuse business relations with those commission merchants who insist upon buying from or selling to yard traders who are not members of the association, we see nothing that can be said to affect the trade or commerce in question other than in the most roundabout and indirect manner."

In Board of Trade of City of Chicago v. United States, supra, proceedings were brought against the board on the ground that its activities ran counter to the Sherman Act because it imposed upon its members certain rules regarding sales which could be said to interfere to some extent with the freedom of contract of its members. The court nevertheless held that since the adoption of the rules tended to improve market conditions, the restraint imposed thereby was not an unlawful one.

The latest case where a combination, entered into the purpose of improving trade conditions, has been upheld, is Appalachian Coals, Inc., v. United States, supra. In that case the defendant producers created an exclusive selling agency, the Appalachian Coals, Inc., all the stock of which they held. This selling agency was to establish standard classification and to sell all the coal of its members at the best price obtainable, and if all could not be sold, the orders were apportioned among members. The officers of the agency fixed prices with certain exceptions. While the decision apparently rested upon the peculiar facts of the case relative to the economic condition of the coal industry, it nevertheless may be accepted as persuasive

authority for the proposition that a combination which had for its purpose the improvement of trade conditions will not be held within the anti-trust statute merely because it possesses inherent power to affect competition among its members.

To quote from the opinion in that case:

"A co-operative enterprise, otherwise free from objection, which carries with it no monopolistic menace, is not to be condemned as an undue restraint merely because it may effect a change in market conditions, where the change would be in mitigation of recognized evils and would not impair, but rather foster, fair competitive opportunities. Voluntary action to rescue and preserve these opportunities, and thus to aid in relieving a depressed industry and in reviving commerce by placing competition upon a sounder basis, may be more efficacious than an attempt to provide remedies through legal processes. The fact that the correction of abuses may tend to stabilize a business, or to produce fairer price levels, does not mean that the abuses should go uncorrected or that co-operative endeavor to correct them necessarily constitutes an unreasonable restraint of trade."

To substantially the same effect may be cited: Maple Flooring Mfrs.' Ass'n v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093; Cement Manufacturers' Protective Ass'n v. United States, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104; National Ass'n of Window Glass Mfrs. v. United States, 263 U.S. 403, 44 S.Ct. 148, 68 L.Ed. 358.

Plaintiff has cited, in support of its contention that the purposes and methods of the Guild come within the condemnation of the Sherman Anti-Trust Act (15 U.S.C.A. §§ 1–7, 15 note), the cases of Eastern States Retail Lumber Dealers' Ass'n v. United States, supra; Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196; Federal Trade Commission v. Raymond Bros.-Clark Co., 263 U.S. 565, 44 S.Ct. 162, 68 L.Ed. 448, 30 A.L.R. 1114; and Paramount Famous Lasky Corporation v. United States, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145.

In some of these cases it is possible to find certain language which, taken out of its setting, might be thought to be in conflict with the conclusions which I have reached. Careful examination of these cases, however, shows that the aims and purposes of the combination were far from

altruistic, and in the Paramount Famous Lasky Corporation Case the conditions imposed by the association upon exhibitors could very readily be found to be arbitrary and unfair and altogether destructive of competition.

I have reached the conclusion, therefore, that upon the facts stated the plaintiff has not shown any threatened loss or damage resulting from the violation of the anti-trust laws, and for that reason is not entitled to injunctive relief. Plaintiff's prayer for a preliminary injunction is denied.

Plaintiff's requests for findings and rulings, so far as consistent with the foregoing, are allowed; otherwise they are denied.