Mary Lucille SANDIDGE, Plaintiff,

v.

Ralph J. ROGERS, Ralph Rogers & Company, Inc., Knox County Sand Company, Mitchell Crushed Stone Co., Inc., C. A. Broecker, Wayne K. Sowers, Gus Sieboldt, W. C. Blakely, Gayle S. Cato and Ruth Rogers, Defendants.

No. IP 56-C-253.

United States District Court
S. D. Indiana,
Indianapolis Division.

Oct. 22, 1957.

288

George E. Weigle, and Louis Pearlman, Jr., Lafayette, Ind., for plaintiff.

Mellen & Mellen, Robert L. Mellen, Bedford, Ind., Barnes, Hickam, Pantzer & Boyd, Alan W. Boyd, and Louis A. Highmark, Indianapolis, for defendants.

HOLDER, District Judge.

Plaintiff commenced her action in this court on September 26, 1956, and after an adverse ruling on a motion to dismiss in which ruling the court without being requested granted leave to plead over, an amended complaint was filed April 15, 1957. The defendants filed their motion to dismiss the amended

complaint for the reason that it failed to state a claim against defendants upon which relief could be granted. The issue presented by the motion to dismiss is presented to the court for a ruling.

Plaintiff claims her action arises under the Anti-Trust Laws of the United States, more particularly under Sections 1, 2, and 7 of the Act of July 2, 1890, generally known as the Sherman Act (26 Stat. 209, as amended by 50 Stat. 693, as amended by 69 Stat. 282), and Sections 4, 7, 12, and 14 of the Act of October 15, 1914, generally known as the Clayton Act (38 Stat. 730, as amended by 64 Stat. 1125, as amended by 69 Stat. 282), said Acts being set forth in Title 15 of the United States Code (15 U.S.C.A. §§ 1, 2, 15, 18, 22, and 24), and other relevant sections of the Anti-Trust Laws of the United States. Plaintiff does not refer in her briefs to any other relevant Anti-Trust Laws than those particularly designated.

The action's central theme is around a lessor's resulting damage from the bumping collision in competition of competing producers of crushed stone which terminated within two years after lessor increased the royalty payments from three to five cents per ton for her lessee, one of the competing producers.

Typical of anti-trust litigation, the complaint and briefs are lengthy and cited authorities are numerous.

### Anti-Trust Statutes

Section 15, United States Code Annotated, Title 15, upon which plaintiff bases her action, provides that the plaintiff may sue for treble damages and reasonable attorneys' fees when she becomes injured in her business or property by reason of any violation by the defendants of the following laws:

Sections 1, 2, and 18, United States Code Annotated, Title 15 read in part as follows:

"§ 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States * * *, is declared to be illegal * * *.

"§ 2. Every person who shall monopolize or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several States, * * * shall be deemed guilty of a misdemeanor, * * *.

"§ 18. No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly. * * *."

The primary purpose of the Anti-Trust Laws is to prevent restraints of interstate commerce in the public interest, and to afford protection of the public from the subversive or coercive influences of monopolistic efforts and the right granted to plaintiff as a private suitor to seek reparation is secondary and subordinate in purpose.

Are the facts alleged in the complaint sufficient to show conspiracy for and/or monopoly and/or an unreasonable restraint upon interstate commerce to the prejudice of the public? To do so resort must be made to the "rule of reason" since the statute does not define "restraint of trade". Appalachian Coals v. United States, Va., 288 U.S. 344, 53 S. Ct. 471, 77 L.Ed. 825; Standard Oil Co. (Indiana) v. United States, Ill., 51 S. Ct. 421, 283 U.S. 163, 75 L.Ed. 926; Leader v. Apex Hosiery Co., 3 Cir., 108 F.2d 71, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; Eastern States Petroleum Co. v. Asiatic Petroleum Corp., 2 Cir., 103 F.2d 315; Westway Theatre v. Twentieth Century-Fox

Film Corp., D.C.Md., 30 F.Supp. 830; 3 Cir., 113 F.2d 932; William Filene's Sons Co. v. Fashion Originators' Guild of America, D.C.Mass., 14 F.Supp. 353; 1 Cir., 90 F.2d 556; Feddersen Motors v. Ward, 10 Cir., 180 F.2d 519; Ruddy Brook Clothes v. British & Foreign Marine Insurance Co., 7 Cir., 195 F.2d 86; 344 U.S. 816, 73 S.Ct. 10, 97 L.Ed. 635; Glenn Coal Co. v. Dickinson Fuel Co., 4 Cir., 72 F.2d 885.

■ Whether the conspiracy for and/or the monopoly and/or restraint upon commerce is unreasonable depends on testing the alleged facts to ascertain whether the defendants' conduct had a detrimental effect on the public since there is no per se violation charged in the amended complaint. William Filene's Sons Co. v. Fashion Originators' Guild of America, D.C.Mass., 14 F.Supp. 353; 1 Cir., 90 F.2d 556; Fosburgh v. California & Hawaiian Sugar Refining Co., 9 Cir., 291 F. 29; Eastern States Petroleum Co. v. Asiatic Petroleum Corp., 2 Cir., 103 F.2d 315; United States v. Columbia Steel Co., Del., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533; 334 U.S. 862, 68 S.Ct. 1525, 92 L.Ed. 1781.

■ Assuming that there was an attempt or an actual monopoly factually charged in the amended complaint under Section 2 of the Act, in order for it to be actionable under Section 15 of the Act, 15 U.S.C.A. § 15, the facts must show an actual or a potential detriment to the public from the attempt to create monopoly or the actual monopoly. The alleged facts must also be examined to determine whether the intended monopoly unreasonably restrains interstate commerce; and whether the alleged facts disclosed an extraordinary control attempted and/or consummated of an appreciable part of interstate commerce was or could be affected by the alleged conduct of the defendants. Times-Picayune Pub. Co. v. United States, La.1953, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277; Bigelow v. Calumet & Hecla Min. Co., C.C.Mich.1908, 167 F. 704; 6 Cir., 167 F. 721.

■ The defendants assert that the amended complaint contains many allegations of legal conclusions which add nothing to the factual averments and must be disregarded in considering the motion to dismiss, with which the court agrees. It is elementary that in order to state a cause of action under the Anti-Trust Laws notice pleading, or the pleading of conclusions is insufficient but that the elements of the action must be alleged clearly, concisely, and particularly and factually. Glenn Coal Co. v. Dickinson Fuel Co., 4 Cir., 72 F.2d 885; Feddersen Motors v. Ward, 10 Cir., 180 F. 2d 519; Shotkin v. General Electric Co., 10 Cir., 171 F.2d 236; Tilden v. Quaker Oats Co., 7 Cir., 1 F.2d 160, 164; Neumann v. Bastian-Blessing Co., D.C.N.D. Ill., 70 F.Supp. 447; Ruddy Brook Clothes v. British & Foreign Marine Insurance Co., 7 Cir., 195 F.2d 86; 344 U.S. 816, 73 S.Ct. 10, 97 L.Ed. 635.

The legal conclusions alleged in the amended complaint are no stronger than the ultimate facts alleged therein would support them. It is these ultimate facts the court will scrutinize.

Stripped of the conclusions the alleged basic facts of the amended complaint are as follows:

The defendant, Ralph J. Rogers, for many years owned stone land, leases, licenses and engaged in the business of quarrying, crushing stone and sales thereof in numerous counties in Indiana and other states. Among the defendant's holdings was the Springville quarry in Lawrence County, Indiana. The defendants engaged in interstate commerce.

The defendant corporations were and are alter ego and dummy corporations of Ralph Rogers and are dominated and controlled by him, and the individual defendants, excepting Ruth Rogers, are officers and directors thereof.

The plaintiff is the owner of real estate in Lawrence County, Indiana, containing five million tons of stone suitable for commercial use in buildings and in paving of roads in interstate commerce. Due to the bulk of the stone, it is neces-

sary to quarry and crush it on the land, which requires equipment for removal, crushing, conveyance and trucking of considerable costs initially and for the operation and maintenance thereof. Therefore, the market of the plaintiff as well as of other landowners generally was limited to large quarry operators with such equipment. Stone is not sold in central markets.

Plaintiff on November 5, 1945, by written agreement authorized a partnership of Nally, Ballard & Cato, later incorporated, to remove the stone from her land for a price of three cents per ton; a new agreement was executed between the parties on January 16, 1950, for the period ending November 1, 1956, increasing the royalties from three cents to five cents per ton, containing a standard quarry provision giving the lessee the right to refrain from operating for any reason at any time during which period a minimum payment of $138.89 per month was to be paid to plaintiff, and further providing the privilege to the lessee to renew the agreement for an additional ten years from November 1, 1956.

During the years of the three cent royalty agreement, the approximate yearly tonnage was 200,000 tons and her approximate yearly average royalty was $6,000; during the years of the five cent royalty agreement, the approximate yearly tonnage was 285,000 tons and her approximate yearly average royalty was $14,000. The stone during these years was shipped and sold in interstate commerce in Ohio, Kentucky, Illinois and other states.

Prior to November, 1951, defendants purchased land adjoined to plaintiff's land on the east and west. Thereafter, the defendants proceeded to prepare and construct on the adjoining land on the west a quarry known as Mitchell Crushed Stone Co., Inc., and transferred equipment thereto from one of Rogers' Colorado quarries.

The defendants through Gayle S. Cato, an officer of the plaintiff's lessee corporation, almost two years after the plaintiff had raised the royalty payments from three cents to five cents, approached plaintiff and proposed to acquire the lease by assignment and to close down plaintiff's quarry unless she reduced her royalty to two and one-half cents per ton, and she further agree to convey the land to Rogers after receipt of total royalties of $50,000, and she agree to accept a royalty of one cent per ton after the conveyance; which she refused to do.

Thereafter, on a date between January 1, 1952, and December 31, 1953, the defendants acquired and purchased the shares of stock and/or assets of plaintiff's lessee corporation and on September 14, 1955, changed its name to Knox County Sand Company.

Thereafter, on or about November 1, 1952, the defendants did destroy and remove all of the quarrying equipment from plaintiff's quarry and directed its customers to defendants' adjacent quarry; defendants piled thousands of tons of waste material around plaintiff's quarry so as to change the natural flow of water from her land, making it economically impossible for plaintiff, or her grantees or her lessees to operate her quarry and without causing water to flow into the defendants, Mitchell Crushed Stone Co., Inc., quarry on the adjacent land; and also thereby flooding plaintiff's quarry.

Thereafter, on April 23, 1956, defendants executed the option provisions of the lease for an extended ten years from November 1, 1956.

Plaintiff has been paid the monthly minimum payments continuously since January 1, 1953, by the defendants and no stone has been produced by the defendants from plaintiff's quarry.

The plaintiff charges that as a result of the conduct of the defendants the following changes and effects have taken place in the stone quarrying and crushing industry in interstate commerce:

That since November, 1951, the defendants have dominated the production of crushed stone in Monroe County, Indiana; that they own or control the only three quarries in Lawrence County, In-

diana, and two of which are operating, producing and selling crushed stone.

That the defendants in 1951 and continuously since have been the largest producers of crushed stone in Indiana.

That during the years 1953, 1954, and 1955, Lawrence County produced approximately eight percent of the whole production of the crushed stone in Indiana. And the plaintiff's quarry when in production prior to 1953 produced approximately three percent of the whole production of Indiana and forty percent of the whole production of Lawrence County, Indiana.

The foregoing stripped down facts discloses that plaintiff has alleged damages and injuries to her property. No attempt or actual unreasonable restraint of trade in or affecting interstate commerce to the detriment of the public has been alleged; and no attempt or actual extraordinary control of an appreciable part of interstate commerce that did or would unreasonably restrain trade or interstate commerce to the detriment of the public has been alleged in the amended complaint.

■ An examination of the amended complaint fails to disclose the factors of price, quality, quantity, service, convenience and accessibility, which are some of the essential elements of an unreasonable restraint of trade, or monopoly. William Filene's Sons Co. v. Fashion Originators' Guild of America, 1 Cir., 90 F.2d 556.

### Price

■ No allegations, other than conclusions, present facts of an attempt or an actual price change of crushed stone in or affecting interstate commerce to the detriment of the public other than the loss of royalty to the plaintiff. There are no alleged facts as to prevailing prices of crushed stone, before and after the alleged conduct, in any of the markets described in the plaintiff's complaint. There is no alleged threatened attempt or consummated effect on price to the public. The plaintiff was affected through loss of royalty, but she and her lessee lawfully agreed long before the

alleged conduct of the defendants that her lessee could withdraw from production providing that a minimum monthly payment be paid her.

### Quality

■ No allegations present facts of an attempt or actual change in quality of crushed stone in or affecting interstate commerce to the detriment of the public. There were no allegations of unusual or a unique supply of quality stone in plaintiff's quarry as compared with other deposits or of produced crushed stone.

### Quantity

■ Quantity is the only factor touched upon in the amended complaint and absent the other factors this is a quantity case.

Defendants assert and plaintiff admits that plaintiff's property produced and never exceeded three percent of the Indiana crushed stone production and forty percent of Lawrence County crushed stone production.

Do these facts show any possible or actual substantial or appreciable effect, or an unreasonable restraint on interstate commerce or injury to the public because such three percent of Indiana production and forty percent of Lawrence County production was eliminated temporarily or permanently? There is no allegation as to the quantity of stone land available and not in production in Lawrence County and the whole of Indiana, but the court takes judicial knowledge of a vast reserve that would require more than the U. S. Mint to organize a monopoly in ownership.

To ascertain this, facts must be alleged defining the relevant market of intrastate and interstate use within which the competitive effects possibly could or actually affected interstate commerce.

The amended complaint does allege the production and use of the relevant market of Lawrence County and of the whole of Indiana. The relevant interstate market is alleged as Ohio, Kentucky, Illinois and other states but the amended complaint is silent as to the pro-

duction and the quantity used by the market in those states either before or after the alleged conduct of defendants.

I hold that elimination of plaintiff's three percent of the crushed stone of the whole Indiana intrastate production could not and does not substantially, or appreciably affect, or unreasonably restrain or injure the public in its flow into interstate commerce. And this is true in the absence of any allegation of crushed limestone production or substitutes in the rest of the United States and assuming that the entire or any part of the production of Indiana is used in interstate commerce. Here again judicial notice makes ridiculous such assumption as there are vast deposits of limestone and other stone substitutes for crushed rock in the specified states and most of the other forty-four states which would reduce the effect of eliminating three percent on interstate commerce both as to the commencement of the flow into commerce and the end of the flow from commerce.

A multitude of authorities have been supplied by plaintiff and defendants briefs but none are completely decisive of the instant case. In those cases cited by plaintiff where relative small quantities as a factor are factually involved, as in the instant case, there were present other factors that are not existent in the instant case and usually quality, uniqueness or some other factor is the determining leverage. For example, the plaintiff leans heavily on the case of White Bear Theatre Corp. v. State Theatre Corp., 8 Cir., 129 F.2d 600, 604. The facts for the purpose of this example were: Defendant for nineteen years had the theatre field to itself in a town of 2,800 population and during the vacation season a drawing population from the town and adjacent area of 10,000. Defendant held exhibitors contracts for all productions of four of the eight major film producers in the industry and a selective contract for part of the productions of a fifth producer. There were three remaining producers with whom defendant had no contracts. Plaintiff established a competing theatre to defendant in the same town. Defendant with the announced purpose of putting plaintiff out of business entered into contracts with two of the remaining major film producers and also bought up a substantial portion of the preceding season's productions of these two companies. Plaintiff succeeded in contracting with only one of the eight major film producers and even after this was done defendant attempted a deal with the eighth producer. Plaintiff had to rely on "western" films and incidental "pickups" available from time to time, and due to the size of the community, programs had to be changed three times a week. Films were produced in California and some processed in other states and was interstate commerce. The court said on the subject of quality factor the following:

"The purpose of the monopoly was * * * to prevent such films as defendants did not need and could not reasonably use from being available to plaintiff in the interstate market. The result of the conspiracy and attempted monopoly, * * *, was to deprive the population of White Bear Lake and its environs of having exhibited to them locally, during the current film season, a large number of 'first-run' productions which they would otherwise have had the opportunity to see * * *."

It was also a fact in the White Bear case that a large portion of 85½% of the entire production of films of the entire United States was denied the right to flow in interstate commerce in the Town of White Bear. Quantity wise this is far greater than that in issue in the instant case let alone the absence of the quality factor.

No allegations, other than conclusions, present facts of an attempt or actual change of flow in quantity of crushed stone in or affecting interstate commerce substantially or unreasonably. On the contrary, the complaint affirmatively shows that the same general average of crushed stone was produced in Law-

rence County and the whole of Indiana for the market after the alleged acts of defendants as was theretofore. The facts further show that plaintiff's stone underlying her land is a part of the operation of defendants' Mitchell quarry on adjacent land to the plaintiff's property and therefore a part of defendants operation, a part of the assets thereof and reserve raw materials, unless plaintiff successfully terminates her lease within the next ten years. The facts further show that plaintiff's land as a part of defendants' Mitchell operation serve the function of preventing disabling water drainage upon defendants' adjoining Mitchell quarry, preserving that stone for interstate commerce which required an investment in engineering and heavy earth moving operations to accomplish let alone the cost of maintaining the monthly minimum payments of the lease. Negatively speaking, there must not have been, or could have been any ill effect to the public from defendants alleged conduct and effective competition must have been given the defendants since the alleged conduct to the advantage of the public for plaintiff's amended complaint was not filed until five years had elapsed and four years before her first complaint was filed, or she would certainly have included in her complaint facts developing the factors of ill effect to the public resulting from defendants alleged possession, or abuse of power, or restraint.

Some cases dealing with quantity disclose the conclusions reached by those courts as to what quantities in given facts are not sufficient to affect interstate commerce. In the case of Glenn Coal Co. v. Dickinson Fuel Co., 4 Cir., 72 F.2d 885, 889, there were 1,000,000 tons in five years mined in one county in the State of West Virginia, as compared to 2,191,016,256 tons mined in the whole of United States, and as compared to 578,181,824 tons mined in the whole State of West Virginia. That court said:

"It is mathematically obvious that the amount of bituminous coal produced from the Black Band seam in West Virginia is almost infinites-imal as compared with the total country-wide production, and it is not reasonable to infer that the public interest has been appreciably affected by the private controversy between the parties * * *."

In the case of United Mine Workers of America v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 584, 66 L.Ed. 975, members of a union were charged with an intention to do what would be the natural result of their own acts of obstructing the intrastate mining of coal in the State of Arkansas from one mine in District 21 would keep 75 percent of 5,000 tons a week from flowing into interstate commerce and such would be an appreciable effect thereon. The court said:

"In a national production of from 10,000,000 to 15,000,000 tons a week, or in a production in District No. 21 of 150,000 tons a week, 5,000 tons a week, * * * would have no appreciable effect upon the price of coal * * * in interstate commerce."

In the case of Appalachian Coals v. United States, 288 U.S. 344, 53 S.Ct. 471, 478, 77 L.Ed. 825, the defendants were 137 producers of coal in eight districts lying in the States of Virginia, West Virginia, Kentucky, and Tennessee. These districts, however, comprised the area stretching from central and western Pennsylvania through eastern Ohio, western Maryland, West Virginia, southwestern Virginia, eastern Kentucky, eastern Tennessee, and northeastern Alabama. Total production of coal in one year in the whole area east of the Mississippi River, all eight districts, was 484,786,000 tons of which defendants mined 58,011,367 tons, or 11.96 per cent. In the four states where defendants were located during one year, coal production was 107,008,209 tons, of which defendants' production was 54.21 per cent, or 64 per cent if the output of captive mines were deducted. The court said:

"The inquiry then, must be whether despite this objective the inherent nature of their plan was such as to

create an undue restraint upon interstate commerce. The question thus presented chiefly concerns the effect upon prices. The evidence as to the conditions of the production and distribution of bituminous coal, the available facilities for its transportation, the extent of developed mining capacity, and the vast potential undeveloped capacity, makes it impossible to conclude that defendants * * * will be able to fix the price of coal in the consuming markets. * * *."

In the case of Bigelow v. Calumet & Hecla Mining Co., 6 Cir., 167 F. 721, 730, the two defendant corporations properties are contiguous situated in the northern peninsula of the State of Michigan, and they mine and refine copper. One company bought shares of the capital stock of the other sufficient to control the company but both were to operate independently, but one should eliminate the other so far as active competition might result from the control. The world's production of copper in one year was 1,600 million pounds, of which amount about 900 million pounds was produced in the United States. The production of the copper called "Lake Copper" was 244 million pounds, or one-fourth of the entire production of the United States and one-eighth of the world production. One of the defendant corporations produced 95 million pounds and the other 18½ million pounds. Together the corporations output would be less than one-half of the "Lake Copper" production, or one-ninth of the product of the United States, and about one-fifteenth of the product of the world. The court said:

"* * *. That the two companies are in a sense competitors, and that the product of their mines will ultimately go into interstate commerce, is far from making out a case of direct or necessary and immediate interference with that kind of commerce. * * *."

In the case of United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 998, 100 L.Ed. 1264, the defendant produced 75 percent of the cellophane sold in the United States, and cellophane constituted less than twenty percent of all "flexible packaging material" sales. The Government contended that, by so dominating cellophane production, defendant monopolized a part of the trade or commerce. The court below found competition from other flexible packaging materials prevented Du Pont from possessing monopoly powers. In the case of United States v. E. I. Du Pont De Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 879, 1 L.Ed.2d 1057, the defendant purchased 23 percent of stock interest in another corporation, described as the colossus of the giant automobile industry ranking first in sales and second in assets in United States industry. In one year it purchased from defendant 68 percent of finishes, and 52.3 percent of fabrics. The court said:

"Because the record clearly shows that quantitively and percentagewise Du Pont supplies the largest part of General Motors' requirements, we must conclude that Du Pont has a substantial share of the relevant market."

### Public Service, Convenience, and Accessibility

No allegations, other than conclusions, present facts of an attempt or actual change in service or convenience, or accessibility to the production or delivery of crushed stone that affects interstate commerce to the detriment of the public. In fact, the complaint shows affirmatively there could be no appreciable change in freight rates by rail or truck in that defendants' Mitchell quarry was adjacent to plaintiff's quarry and the entrance thereto one-fourth mile away.

The plaintiff vaguely and by conclusion seeks to establish a theory that landowners as a class were deprived of utilizing the land by the large quarry owners leasing practices and other devices. The amended complaint does not allege the amount of stone land avail-

able, except that it is generally located in southern Indiana; nor does it allege the amount of land controlled by the large quarry owners; nor does it allege any conspiracy or combination of the large quarry owners, other than lessee, (certainly the lessee was not a large quarry owner), with the defendants which would make these defendants responsible under the Act for such conduct, if properly alleged; no allegations were made to show the landowners royalty arrangements before and after the alleged conduct so as to reflect the situation of which plaintiff vaguely describes.

The plaintiff freely and voluntarily entered into the market with her stone land and obtained her price with the right to her lessee to not produce crushed stone for a consideration and with the right to assign without her consent. The lessee assigned the first lease from a partnership to a corporation and the second lease to the defendants, and now five years after the deactivating of her quarry, she seeks the lucrative remedy provided by the Anti-Trust Laws. The Anti-Trust Law does not forbid the lessee from assigning its lease to defendants unless the public could or would be damaged thereby.

The plaintiff has described defendants as being a large quarry owner in Indiana and with numerous quarry holdings in other states. Such in itself does not describe but vaguely and through conclusions that defendants could through their operations injure the public by restraining trade in interstate commerce. Actually the plaintiff only alleges that defendants dominate the crushed stone production and market in Lawrence and Monroe Counties, Indiana; and only factually recites the production figures of Lawrence County operations. Here again there are no allegations of price, quality, or quantity or other factors that disclose an unreasonable restraint of trade in interstate commerce that would or could be a detriment to the public.

This is not a case of a number of independent large quarry owners entering into a combine or other organization.

The amended complaint settles on Ralph Rogers, as the major domo, or large quarry owner and operator with the corporate defendants as his alter ego dummy corporations, with the other defendants except Ruth Rogers and Gayle S. Cato, as officers thereof. The only other producer was plaintiff's lessee who is named a conspirator along with Gayle S. Cato, its officer which lessee produced only three percent of the Indiana production of crushed stone and could hardly be classed as a large quarry owner.

Plaintiff's briefs refer to publications of the U. S. Bureau of Mines that substantiates her allegation that Rogers was a large producer. Plaintiff is certainly in possession of facts of other large producers in Indiana and other states, as well as whether plaintiff's lessee was a large quarry producer all of which leads this court to the conclusion that after sustaining one motion to dismiss the plaintiff would have included ultimate facts within her knowledge from such research, if the facts supported her generalities of the size of Rogers and would disclose the number of competitors in Indiana. Therefore, this court cannot conclude from the amended complaint that plaintiff's lessee was a large operator, or that the general allegation of Rogers being the largest operator is anything approaching such bigness that defendants completely dominate the crushed stone market in Indiana, or in other States, or the result thereof on interstate commerce.

The Anti-Trust Law does not forbid competition but fosters competition. I know of no restriction on the defendants constructing a quarry adjacent to plaintiff's property to furnish competition to plaintiff on a township level area. No allegations are made of any unfair practices on defendants part in causing plaintiff's lessee to sell its lease and corporation to the defendants. Nothing in the Anti-Trust Laws forbids the acquisition of the lease or plaintiff's lessee corporation in itself and a complete integration of the quarries unless the public is damaged or might be dam-

aged appreciably in interstate commerce. The mere size of the defendants in itself is not a violation of the Anti-Trust Law without accompanying factors such as have been discussed herein.

Factually the amended complaint does charge that the defendants acquired the corporate stock and/or assets of plaintiff's lessee. Under Section 18 of the Act such conduct of itself is not per se a violation of the Act as the acquisition of stock is lawful, in and of itself, but may be wrongful and unlawful when considered with the other facts. 15 U.S.C.A. § 18.

The other facts together with the acquisition of the stock and/or assets and the effect on interstate commerce has been fully considered in this opinion concerning Sections 1 and 2 of the Act. No substantial lessening of competition, or tendency to create a monopoly, or detriment to the public is found to be alleged in the amended complaint that would be violative of Section 18 of the Act, 15 U.S.C.A. § 18.

The defendants admit that the intrastate operation of plaintiff and defendants could, if other factors were present, affect interstate commerce, within the holdings of cases cited by plaintiff. The defendants further admit that the crushed stone does enter into the flow of interstate commerce. Yet defendants press and plaintiff extends her briefs to answer the proposition that a non-operating lessor, cannot maintain a treble damage action for the conspiracy, or monopoly, or restraint of trade in interstate commerce against a lessee and a third party. Neither of the parties briefs cite Judge Swaim's opinion in the case of Congress Building Corporation v. Loew's, Incorporated, 7 Cir., 246 F.2d 587, decided May 31, 1957, and rehearing denied July 29, 1957, which is conclusive against the defendants and the authorities relied upon in their briefs.

The plaintiff relies in her briefs principally upon the cases of Mandeville Island Farms, Inc., v. American Crystal Sugar Co., 1947, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328; White Bear Theatre Corporation v. State Theatre Corporation, 8 Cir., 1942, 129 F.2d 600; Gamco, Inc., v. Providence Fruit & Produce Bldg., Inc., 1 Cir., 1952, 194 F.2d 484; Darnell v. Markwood, 1954, 95 U.S.App.D.C. 111, 220 F.2d 374; and Steiner v. 20th Century-Fox Film Corporation, 9 Cir., 1956, 232 F.2d 190.

The White Bear Theatre Corporation v. State Theatre Corporation, supra, case has already been considered by the court in this opinion, and I do not deem it controlling of this case, but agree with the law enunciated therein on the facts of that case.

The Steiner v. 20th Century-Fox Film Corporation, supra, case is primarily cited by the plaintiff in support of the theory that a nonproducing lessor could sue a lessee and third party conspiring to restrain and monopolize interstate commerce. This issue was covered in this opinion with the citation of the Congress Building Corporation v. Loew's, Incorporated, supra.

The Mandeville Island Farms, Inc., v. American Crystal Sugar Co., supra, case is cited primarily in support of the rule that although plaintiff herein operated in intrastate commerce and although the alleged acts of the defendants herein who operated directly only upon intrastate commerce nevertheless could violate the Anti-Trust Laws if there was an attempt, or actual or real possibility of substantial effect upon interstate commerce of such intrastate commerce flowing into interstate commerce to the public detriment, or an attempt, or actual or real possibility of an unreasonable substantial restraint upon interstate commerce to the detriment of the public of such intrastate commerce flowing into interstate commerce. This proposition is also covered in this opinion that the court agrees with the principle and further that the defendants concede that intrastate operation of plaintiff and defendants could, if other factors were present, affect interstate commerce within the holdings of the Mandeville case, supra, and other cases cited by plaintiff which relegates

the issue to be decided as to whether the factor of quantity in the instant case together with the other facts is sufficient to make plaintiff an Anti-Trust case.

The amended complaint contains allegations according to plaintiff to bring the instant case within the principles of the Mandeville case, supra. I fail to see the similarity with the stone business described in the amended complaint and the business of refining and marketing of beet sugar in that case, and although plaintiff's allegations stripped of conclusions are similar to that case in certain respects, the ultimate factual case alleged is so completely different that such similarities are of no significance. In that case all of the growers of sugar beets in a large area in California alleged that the only three refiners with plants in the area were the only available purchasers of their crops, had entered into an agreement among themselves with respect to a uniform price to be paid the growers and thereby deprive the latter the benefit of free competition in interstate commerce which substantially affected interstate commerce as to price and because of the widely scattered location of beet sugar growers in other states, the refiners of each region were shown to have a competitive advantage over growers and refiners in other regions with respect to interstate market served by being nearest at hand. The instant case does not involve a combination of independent stone quarry operators to deal with all landowners in the stone producing area of Indiana on a uniform basis. Plaintiff here voluntarily entered into her contract with lessee without compulsion from defendants or any combination of quarry owners. That case is further dissimilar in that there is no allegation in the instant case that defendants controlled all of the stone producing facilities in the Indiana area, or any other area comparable to that case. In that case, the defendants were able to control price in interstate commerce while in the instant case such is not true in interstate commerce, as the intrastate production in Lawrence County is in headon competition with other stone producers of Indiana and the producers of the other states. In the instant case the quantity of stone involved is infinitesimal by comparison to the factor of quantity involved in that case as well as whatever control of such quantity of stone had on the interstate or intrastate market in stone.

The Darnell v. Markwood, supra, case was an action under Section 3 of the Sherman Act which prohibits combinations in restraint of trade of *local trade* in the *District of Columbia*. This case is of no aid to plaintiff for under such section of the Act the effect on interstate commerce is immaterial.

The first circuit case of Gamco, Inc., v. Providence Fruit & Produce Bldg., Inc., supra, case found that defendants did have a monopoly power in the antitrust sense in that the building they controlled could be effectively utilized in the wholesale business of selling, storing, and shipping fruit and vegetables and that such power had been utilized for the purpose of preventing a "potentially lower priced" [194 F.2d 488] out-of-state firm, who had bought an existing lease from a tenant lessee of defendants, from engaging in the business of competition with the tenants and stockholders of the defendants. The facts are dissimilar from those in this case and it is obvious from the scant facts that the plaintiff therein was the recipient of interstate commerce from the entire United States in perishable fruits and vegetables for that locality. I choose to follow the "rule of reason", herein supported by authorities, that to be a Section 2 case of the Sherman Act, there must be or could be a substantial effect on interstate commerce and could be or must be a detriment to the public. Defendants in this case did not possess the sheer power of monopoly over competitors generally in the crushed stone industry in Indiana, or the owners generally of stone land in Indiana so that their competitors generally were or could be eliminated and substantially affect interstate commerce. In the Gamco case, supra, and the au-

thorities it cites, the sheer power of monopoly to eliminate competitors generally was present. The Gamco case, supra, is not controlling the facts of this case.

Other briefed matters including the applicability of the Indiana Statute of Limitations concerning penalties and forfeitures; and whether plaintiff has a tort action outside of the Anti-Trust Laws against the defendants, or whether she can cancel the lease for the defendants failure to quarry and produce royalties need not be discussed for disposition of this case.

The motion to dismiss the amended complaint is sustained.